UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CRIM NO.  19-303 (CRC) |
| | : | |
| ZACHARY RAGONE, | : | |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

For the reasons set forth herein, the government recommends that the Court sentence the defendant to a term of incarceration of 151 months to be followed by 120 months of supervised release, with the conditions recommended by United States Office of Probation.  Additionally, the defendant is required by statute to register as a sex offender for a minimum period of 25 years.  In support of this memorandum and recommendation, the government relies on the following points and authorities, and such other points and authorities that may be cited at the sentencing hearing.

**I.      BACKGROUND**

**A.      Statement of Offense**

Leading up to Monday September 24, 2018, Detective Timothy Palchak, the undersigned Detective/Task Force Officer (herein "UC") was acting in an undercover capacity as part of the Metropolitan Police Department-Federal Bureau of Investigation ("MPD-FBI") Child Exploitation Task Force.  In that capacity, the UC posted an advertisement on a website known to law enforcement as a platform used by individuals that have a sexual interest in children among other things.  The site is an anonymous social networking application where users are given a random nickname upon joining and can later change the name if they choose to do so. Users then post confessions, either fact or fiction, by super imposing text on a photo.  The

1

application has its own gallery of photos and fonts to choose from for the posts, which helps protect the anonymity of users. The UC posted a message in a group called, "Single Dads." The message read, "And other dads babysitting? ☐ pm me," superimposed over an image of a man.

On the afternoon of Monday September 24, 2018, a user using the name, "anonymous," later identified as the defendant, Zachary Franklin Ragone, contacted the UC and began a private chat communication. During the course of the chat the defendant said he was a 35 year-old male residing near Dulles Virginia. The UC informed the defendant that he had a 3 year-old niece and a 9 year-old daughter. The defendant responded, "Been messing with them both?" The UC responded, "Yes, mostly rubbing and jerking on them." The UC then began asking the defendant more questions:

| | |
|---|---|
| UC: | U ever meet or get pics from any young ones |
| Defendant: | I've never met but would absolutely try if I had the chance. I have seen some pictures |
| UC: | Mmmm what's the youngest pics u have |
| Defendant: | I guess 2-ish |

Shortly after, the defendant asked the UC if he had a Wickr or Telegram account. The UC stated that he had KIK and provided his screen name. On September 24, 2018, the defendant sent the UC a message via KIK. The defendant used the KIK screen name, "letshavefun8291" with a display name of "Frank Lynn."

During the course of the chat, the defendant sent the UC a clothed image of a prepubescent child, stating, "Gotta love the cute little ones." The UC then sent the defendant an image of his purported 9 year-old child, which led to the following exchange:

| | |
|---|---|
| Defendant: | Mmm cute little girl |
| UC: | Thanks man |

2

| | |
|---|---|
| UC: | Your pics hardcore or normal |
| Defendant: | I'm sure those eyes would be so sexy looking up with a cock in her mouth |
| UC: | Yes for sure |
| Defendant: | Generally normal on kik unless I'm confident the person is fully safe. Since it doesn't have self destruct timers |
| UC: | Ah I understand can't be too careful |
| Defendant: | Yeah.  That's why I normally like telegram or wickr and don't mind taking the first step there because I can make it auto delete.  But on kik I don't feel safe being the first to share |

The defendant continued sending messages to the UC asking about the UC's purported daughter's body and what the UC likes to do sexually to her.  The discussion then turned to the 3-year-old:

| | |
|---|---|
| UC: | The 3 yo is easy |
| UC: | You ever played |
| Defendant: | How often do you see her |
| Defendant: | No, I wish.  Would love to |
| UC: | Every other week or so |
| Defendant: | Babysit her for the day every so often basically? |
| Defendant: | When did you last play with her? |
| UC: | Yep |
| UC: | Today lol |
| Defendant: | Mmm, lucky man |
| Defendant: | She already gone? |
| UC | The lil one yes |
| Defendant: | Too bad |

On September 25, 2018, the defendant reached back out to the UC to tell him that he was in D.C. for training and asked the UC if he lived in the city. When the UC responded that he did, the defendant suggested getting together so that he could show the UC some of the videos he has. He also asked the UC "Baby sitting any more this week? May be off between 3 and 4 most days." The UC responded that he might have the 3-year-old the next day, and the defendant said "Hopefully tomorrow can work out." The defendant then said he would love to see a picture of the UC's niece and said "I'm sure you'll like seeing her hand on my cock as you watch a little girl being fucked as well."

On Wednesday September 26, 2018, the defendant again initiated contact with the UC via KIK. The defendant stated, "Haven't stopped thinking about this since yesterday." During the course of the chat the UC informed the defendant that he was babysitting his 3 year-old niece that afternoon. The UC then asked the defendant if he had anything he could share on Wickr since he does not like to share anything over KIK. The defendant provided his Wickr screen name as "letshavefun9182" and the UC responded with his screen name.

The defendant began communicating with the UC on Wickr. The defendant sent the UC an image of what appears to be an underage teenage girl with her breasts exposed. The UC sent the defendant two images of his purported daughter with a sign held in front of her with the date and the message "For Frank." During the course of the chat the defendant sent the UC two images depicting child pornography. The first image depicted a female toddler performing oral sex on an adult male penis. The second image depicted an adult male inserting his erect penis in a prepubescent child's vagina. The defendant set the images, as well as most of his messages, to delete automatically a few minutes after the UC received them. The UC was able to preserve the images and messages before they deleted.

The UC then informed the defendant that his daughter was going to be with her mother so he would only have the 3 year-old, and asked if three was too young for the defendant. The defendant responded "No, 3 isn't too young. Would definitely play with her." The UC and the defendant then engaged in the following exchange:

| | |
|---|---|
| Defendant: | Will do anythijt and everything you'll let me do with the 3 yo |
| Defendant: | Hopefully she'll truly look like your niece, including the cock in her mouth. |
| UC: | Ok no hardcore pen but I'm open to licking sucking and cumming on her |
| UC: | What u want to do the most with her ? |
| Defendant: | Mmmm, my biggest would be to lick her little cunt and have her suck me |

The two then made plans to meet at a bar after the UC's purported niece was dropped off with him and the defendant was finished with his training. The conversation then moved from Wickr back to KIK and they continued to discuss the plan:

| | |
|---|---|
| UC: | Man I'm so fucking excited . Can wait to see her with another cock |
| UC: | I'll shoot u a message as soon as I hear back |
| Defendant: | Mmm, God I can only imagine how good it'll feel with her mouth around my fat head |
| UC: | Mmmmm |
| UC: | Yes |
| Defendant: | Does she seem to have fun when you touch and play? |
| UC: | Oh yes , sometimes she is bored but most of the time she seems to enjoy and likes to play with the cum on her fingers |
| Defendant: | Mmmm good.  That makes it so much more fun if she actually is liking it |
| UC: | Oh yes she does and never cry's or anything like that |
| Defendant: | My mouth is watering imagining getting my tongue inside her |

5

| | |
|---|---|
| UC: | Mmmmm fuck I can't wait |
| Defendant: | Me too.  So not going to be able to concentrate in class this afternoon.  And I'll be peeking st my phone constantly for updates lol |
| Defendant: | Id love to hold her pussy lips open and let you cum on her exposed hole |

They continued discussing the plan to meet up that afternoon and the chat continued:

| | |
|---|---|
| UC: | What are you most looking forward to or wanting?" |
| Defendant: | Can't wait to see your face when I spread her little pussy apart |
| UC: | What about u |
| Defendant: | Mm mmm fuck |
| Defendant: | That first moment tasting her |
| Defendant: | Your and her reaction seeing a little girl being fucked |
| Defendant: | Watching her sucking you or sucking me |

The defendant and the UC continued exchanging messages throughout the afternoon.  On September 26, shortly after 4:00 p.m. the defendant met the UC at a prearranged location in Washington, D.C.  The defendant approached the UC at the location and introduced himself as Frank.  The UC exchanged pleasantries and then stated that his sister- n-law was dropping off his niece in 5 to 10 minutes. The UC stated that he was going to use the restroom and then they would walk towards his apartment. The defendant stated "ok that will give me time to cool off." As the UC proceeded to the restroom, the defendant was arrested without incident.  The defendant's black iPhone X was seized incident to his arrest.

Following his arrest, the defendant was advised of his rights and waived them, agreeing to speak with the agents.  The defendant stated that he is employed by the Transportation Security Administration as a program analyst.  During the interview, the defendant admitted to distributing child pornography to the UC.  Specifically he stated that he has been interested in

child pornography since he was 12 years old. He admitted to meeting the UC on the above-described application and responding to the UC's post. The defendant responded to the post, even though he does not have any children. The defendant and the UC chatted over this application and then moved their conversation to KIK. The defendant stated that he could not remember what his actual KIK name was, but he believed it to be "letshavefun" with some numbers at the end of the name.

The defendant further stated that he used Wickr to send the UC two to three pictures containing child pornography. The defendant described the photos as one being multiple "children" nude, and stated that he could not remember if they were engaging in sexual acts, and the second one as a female child engaging in a sex act.

The defendant said that the photos he sent to the UC were part of a collection that he had on his iPhone X cell phone. The defendant stated that he was on Reddit, a blogging website, and saw that someone was looking to share "kinky" things with others. The defendant responded that he was interested to see what the poster possessed, and the Reddit user sent the defendant a link. Once the defendant accessed the link, he saw that it contained child pornography. He then saved the photos to an encrypted private application on his iPhone X cell phone. At the time of the interview, the defendant stated that he could not remember the name of the application in which he stored the photos on his phone. The photos that the defendant send to the UC came from this application and the defendant stated that there were 100 or more photos and videos in his application containing child pornography. The defendant also stated that in the past he has downloaded child pornography, but deleted it because he felt that it was bad for him to look at it.

The defendant's black iPhone X was forensically examined pursuant to a search warrant. Because of the passcode on the device, law enforcement was not able to conduct a full physical

examination of the phone. Agents were able to perform a partial file system extraction using GrayKey. Located on the device were over 150 images and approximately 7 videos depicting child pornography. The images and videos depicted prepubescent children, including infants and toddlers, being sexually abused by adults, prepubescent children engaged in sexual acts with animals, and bondage of prepubescent children. The phone also contained a database listing the files contained in an encrypted mobile application. While some of these files were recovered in the extraction, many of the files were not able to be recovered in the partial forensic extraction and only the file names themselves were visible. Examples of such file names are: "Black Young anal.mov," "Asian kids fuck.mov," "dog lick little girl.mov," "Toddler-Boy and Man(2).wmv," and "mom suck little boy.mov."

      **B.**    **Procedural Posture**

The defendant was arrested on June 28, 2018, and charged by Complaint with Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2). On January 25, 2019, the government filed an Information charging the defendant with Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2). On February 21, 2019, the defendant pleaded guilty to the sole count in the Information under a written plea agreement.

**II.**    **SENTENCING CALCULATION**

    **A. Statutory Penalties**

The offense of Distribution of Child Pornography, in violation 18 U.S.C. § 2252(a)(2), carries a mandatory-minimum prison sentence of 5 years and a maximum sentence of 20 years imprisonment, a maximum fine of $250,000, and a term of supervised release of not less than five years and up to life pursuant to 18 U.S.C. § 3583. See Presentence Investigation Report (PSR) ¶¶ 104, 109, 121. Pursuant to 18 U.S.C. § 3013(a)(2)(A), the defendant must pay a

mandatory special assessment fee of $100 for each felony conviction payable to the Clerk of the United States District Court for the District of Columbia. The defendant must also register as a sex offender for a minimum period of 25 years pursuant to 18 U.S.C. § 2250 and 34 U.S.C. §§ 20911(3), and 20915(a)(2).

### B. Sentencing Guidelines Range

The government agrees with the calculation of the defendant's Guidelines sentencing range set forth in the PSR. See PSR §§ 28-42. The base offense level is 22 pursuant to U.S.S.G. § 2G2.2(a)(2). The government agrees with the PSR that several specific offense characteristics apply: the offense involved a prepubescent minor or minors under the age of 12 (+2); the offense involved the knowing distribution of child pornography (+2); the offense involved material that portrays sadistic or masochistic conduct or the sexual abuse or exploitation of an infant or toddler (+4); the offense involved the use of a computer or an interactive computer service (+2); and the offense involved 600 or more images (+5). See id. ¶¶ 30-34. No additional adjustments apply. See id. ¶¶ 35-37. The defendant's adjusted offense level is therefore 37. Id. ¶ 38.

The defendant is entitled to a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a). Id. ¶ 40. The government requests that the defendant's level be decreased by an additional point pursuant to § 3E1.1(b), as the defendant timely notified authorities of his intention to enter a guilty plea and thus permitted the government and the Court to preserve resources. § Id. § 41. With these adjustments, the defendant's total offense level is 34. PSR ¶ 42.

The defendant has a total criminal history score of zero. According to the sentencing table in U.S.S.G. Chapter 5, Part A, a criminal history score of zero establishes a criminal history category of I. With a total offense level of 34 and a criminal history category of I, the

defendant's recommended guideline sentencing range is 151 months to 188 months, a supervised release range of 5 years to life, and a fine range of $35,000 to $250,000. Id. ¶¶ 105, 109, 125.

## III. GOVERNMENT'S RECOMMENDATION

### A. Application of the Federal Sentencing Guidelines

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). Booker, 125 S. Ct. at 756.

In post-Booker cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. See United States v. Gall, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.") After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). Id. These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing

disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

### B. Basis for the Government's Recommendation

The government submits that a sentence of 151 months incarceration, to be followed by 10 years supervised release, and the specific conditions of supervision recommended by the United States Office of Probation, is appropriate and warranted based on the factors outlined in 18 U.S.C. § 3553(a).  The recommended sentence is sufficient, but not greater than necessary to accomplish the purposes of sentencing.  The sentence recommended by the United States represents the bottom of the Estimated Guidelines Range as outlined in the plea agreement. Given the serious nature of the defendant's conduct in this case and his risk to the community, balanced against his lack of criminal history and early acceptance of responsibility, the government believes this is an appropriate sentence.

**1. Nature and Circumstances of the Offense**

The defendant's distribution of child pornography demands the imposition of a term of incarceration. The videos and images that the defendant trafficked and possessed did not simply depict child erotica or sexual images of teenagers or underage persons—instead, they graphically depicted sexual acts being performed on prepubescent children, including infants and toddlers. Additionally, he distributed images to a person whom the defendant believed had access to his 3-year-old niece.  The defendant's distribution of these materials was a way to prove his sexual interest in children to a like-minded sexual abuser exemplifies the harm that the distribution of child pornography causes to the victims and to society at large.

The essence of the crime to which the defendant has pleaded guilty does not lie simply in the sharing or receiving or images and videos; it is about the children in those images and videos.

It is about children who, at the moment they were photographed, are being treated at best as sexualized objects and at worst being horrifically and repeatedly sexually abused. The abuse of child pornography victims does not end, however, when the physical contact or production of images or videos is over. The abuse and harm go on as long as those images and videos are viewed, traded, collected, and used by offenders for sexual gratification. In this age, victims of child pornography must attempt to cope with the knowledge that the worst moments of their young lives are forever memorialized and available to child pornography consumers.  This is articulated extremely well in the various victim impact statements provided to this Court under seal.  Individuals—like the defendant—who receive, seek, view, keep, trade, distribute, and use child pornography for their own sexual gratification are part of the illicit market for child pornography, which continually re-victimizes the children in already-existing images and videos and promotes the victimization of even more children for new images and videos.

Two elements of the defendant's conduct in this case distinguish him from other offenders who sent images or videos over the internet.  First, the defendant made clear through his actions that he is experienced in the distribution of child pornography.  He insisted that it should be done over a platform that has a self-destructing timer for the images, as he did not feel comfortable distributing over Kik.  The defendant insisted on this to provide him more security in committing conduct which he knew to be wrong and illegal.  Second, while the defendant pleaded guilty to Distribution of Child Pornography, his conduct did not end with sending the images to the UC.  He also traveled across state lines to abuse the UC's 3-year-old niece.  The comments he made about what he wanted to do to that very young child are incredibly disturbing.  In light of the steps he took to conceal his conduct and the travel he engaged in, a guideline sentence is appropriate in this case.

**2. Defendant's History, Characteristics, and Cooperation**

Defendants in child pornography cases often possess positive characteristics that allow them to remain undetected in society. Quite often, defendants in these cases appear to be like any other law-abiding citizen, with education, work histories, and supportive families. The danger they pose to children is often not readily apparent. The defendant fits this mold. He has no significant prior criminal history, was employed at the time of his arrest, and has a supportive family.

The Psychosexual Risk Assessment Report prepared by Dr. Sorrentino does not provide the government comfort as to the defendant's risk. The defendant describes his own distress about his sexual symptoms as severe and said he has had trouble controlling his sexual behavior since the age of 13. See Sorrentino Psychosexual Evaluation at 7. Further, Dr. Sorrentino diagnosed the defendant with Hypersexual Disorder as well as Pedophilic Disorder. Id. at 13. While the defendant received a lower score on the Child Pornography Offender Risk Toll ("CPORT"), Dr. Sorrentino acknowledged that there are no risk levels associated with the score. Id. at 14. Further, the list of dynamic risk factors outlined by Dr. Sorrentino are very troubling. It is not at all surprising that the defendant ended up in this situation with the combination of deviant sexual interests, sexual preoccupation, sexualized coping, relationship problems and poor problem solving that are outlined in the report. Id. at 16.

While Dr. Sorrentino concludes that Mr. Ragone's risk of committing future offenses can be managed by treatment and internet monitoring, the government is far less confident in that conclusion. First, an interest in having sex with children is not something that is easily controlled. It is clear from the defendant's own statements that he has been trying to fight this desire for some time. Second, it is important to note that as part of Dr. Sorrentino's list of factors

lowering the defendant's risk of sexually offending again is the lack of history of previous sexual offenses.  Id. at 16.  However, it is clear from the defendant's own statements that he has been committing offenses for years, repeatedly viewing child pornography since his adolescent years, at a minimum.  Id. at 7.  And based on the facts of this case, as well as the defendant's statements, he was clearly very active at committing child exploitation offenses on the internet.  For example, he describes being a part of chat rooms where people were posting about prepubescent children, and chatting with what he characterizes as adults posing as prepubescent children.  Id. at 7.  Further, when discussing the current offense, he expressed a familiarity with "that dance" of sending child pornography to get some in return.  Id. at 8.  And, he directed the UC to a platform he believed was more secure.  While there is no evidence or statements by the defendant that he has actually touched or abused a child, these prior sexual offenses involving child exploitation material are troubling.  Further, the current offense is a significant escalation of the type of chatting in which he had previously been engaged.  He showed up to meet a man who was bringing a 3-year-old child for the defendant to abuse.  And the defendant made clear in the plea and in his conversations with Dr. Sorrentino that he had planned to abuse the child.  As a result of all of these factors, the government does not believe Dr. Sorrentino's reliance on a lack of prior sex offenses is warranted.

### 3. Punishment, Deterrence, Protection, and Correction

The sentencing court "shall impose a sentence sufficient, but not greater than necessary" to comply with the need for a sentence: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant;

and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The government's recommended sentence is sufficient, but not greater than necessary, to provide just punishment for the defendant's offenses. The defendant's distribution of child pornography is harmful to society at large, as well as the specific child victims, and warrants a substantial sentence of imprisonment. As a matter of general deterrence, a sentence of incarceration within the guidelines signals that trafficking in child pornography represents a serious crime that cannot be tolerated. As a matter of specific deterrence, a prison sentence is appropriate and necessary to deter the defendant from committing future child exploitation crimes. Furthermore, a term of 10 years supervised release, with specific conditions recommended by the probation office, is crucial to ensuring that the defendant receives the treatment and support he needs to make further attempts to ensure that he does not commit similar offenses in the future.

### 4. Available Sentences

The defendant should be sentenced to a term of incarceration, as he is ineligible for probation because it is expressly precluded by the statute. According to the PSR, the defendant does not appear to have the ability to pay a fine. *See* PSR ¶ 96. In addition, the court should impose a lengthy term of supervised release to ensure that the defendant does not re-offend. The conditions of supervised release should include: sex offender evaluation and treatment, restrictions on direct contact with minors, and monitoring of the defendant's use of the Internet, computers, and any other Internet-capable devices. Essentially, the Court should impose all of the special conditions recommended by the United States Office of Probation in the PSR and at sentencing.

**5. Restitution**

Restitution in this case is mandatory under 18 U.S.C. §§ 3663A and 2259. Because the offense conduct in this case occurred in September 2018, the Amy, Vicky and Andy Child Pornography Victim Assistance Act does not apply because the updated law was not passed until December 7, 2018. Therefore, restitution is governed by 18 U.S.C. §§ 2259 (2017), 3663A, 3664 and 3583(d).

Commendably, prior to sentencing in this matter, the defendant, through his counsel, voluntarily negotiated restitution agreements directly with the counsel for the three known victims identified in this case who are seeking restitution.[1] The defendant agreed to pay each of the identified victims seeking restitution $1000, for a total of $3000. To the extent those payments have not been made as of the date of sentencing, the government will be requesting, as part of the Judgement and Commitment Order in this case, that the Court order restitution to be paid to victims "Henley," "John Doe 4" & "Jenny" in the amount of $1000 each. If restitution payments have already been made, the government requests that the three victims be listed as such on the Order stating that restitution payments have been completed.

---

[1] The victim impact statements for these victims, as well as several others who submitted statements but are not seeking restitution, are being separately filed under seal.

## CONCLUSION

WHEREFORE, for all of the reasons set forth herein, the government recommends that the Court sentence the defendant to a term of imprisonment of 151 months, to be followed by 10 years of supervised release, with the recommended conditions of supervision. The defendant is further required by statute to register as a sex offender for a minimum period of 25 years.

Respectfully submitted,

MICHAEL R. SHERWIN
ACTING UNITED STATES ATTORNEY


_____/s/ Jodi Lazarus_____
Jodi Lazarus
Assistant United States Attorney
D.C. Bar 975420
555 4th Street, N.W., Room 10-122
Washington, D.C. 20530
(202) 252-7053
jodi.lazarus@usdoj.gov